# UNITED STATES DISTRICT COURT
## for the
### Southern District of Ohio

In the Matter of the Search of )
*(Briefly describe the property to be searched or identify the person by name and address)* )
) Case No. 2:21-mj-336
3149 Fayburrow Drive )
Reynoldsburg, Ohio 43068 )
Including all outbuildings and curtilage )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A

located in the **Southern** District of **Ohio**, there is now concealed *(identify the person or describe the property to be seized)*:

See attachment C

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 846 | Conspiracy to Possess with Intent to Distribute Controlled Substances |
| 21 USC 841 (A)(1)(a) | Distribution and Possession with Intent to Distribute Controlled Substance |

The application is based on these facts:
See Affidavit in Support of Search Warrant

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Christopher L. Ellison - DEA Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by **Telephone** *(specify reliable electronic means)*.

Date: 5/13/2021

*Judge's signature*

Chelsey M. Vascura
United States Magistrate Judge
*Printed name and title*

City and state: Columbus, Ohio

## ATTACHMENT A

### DESCRIPTION OF PROPERTY TO BE SEARCHED

**TARGET LOCATION 1: 3149 Fayburrow Drive, Reynoldsburg, Fairfield County, Ohio, 43068, including all outbuildings and curtilage** is described as a single family, two-story home with attached garage. The front of the structure if further described as having tan siding with brown trim. The front door is described tan with white casing and brick fascia around the door. The numbers "3149" are clearly marked in large letter to the left of the door.

## ATTACHMENT C

### DESCRIPTION OF ITEMS TO BE SEIZED

The evidence to be searched for and seized is:

A.  Methamphetamine, fentanyl, cocaine, and any other controlled substances;

B.  Documents and other items tending to show dominion and control over the premises/vehicle, including, but not limited to, bills or other business-related documents, correspondence, and photographs;

C.  Documents or other items tending to identify co-conspirators and sources, including, but not limited to, letters, notes, memoranda, photographs, address and phone books, maps, organizers, or lists of names;

D.  Items commonly used to facilitate drug trafficking, including but not limited to items such as firearms, ammunition, cellular telephones, pay/owe sheets, packaging materials, "cut", scales, and grinders;

E.  Likely proceeds of drug trafficking, such as United States currency and other negotiable instruments; and

F.  Documents and other items tending to establish or hide the whereabouts of proceeds from drug trafficking, such as safes, keys to other locations, and financial records.

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Christopher L. Ellison, being first duly sworn, hereby depose and state as follows:

### I.

### INTRODUCTION AND AGENT BACKGROUND

1. I am employed as a Sergeant for the Ohio State Highway Patrol, currently assigned full-time as a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), Columbus District Office. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18 United States Code (U.S.C.) § 2510(7), that is, an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in Title 18 U.S.C. § 2516. Your Affiant has been employed by the State of Ohio as a "Law Enforcement Officer," as defined in the Ohio Revised Code Section 2901.01, since 2004. Your Affiant is empowered to investigate, to make arrests with or without warrants and to execute search warrants under the authority of Title 21 U.S.C. § 878 and the Ohio Revised Code.

2. Prior to being assigned to the DEA Task Force, your Affiant was the assistant commander of an inter-agency collaborative between the Ohio State Highway Patrol, Cincinnati Police Department, and DEA – Cincinnati from 2017-2018, the assistant commander of the Ohio State Highway Patrol Wilmington District Criminal Patrol Unit from 2016 – 2017, assigned as a Task Force Officer with the West Central Ohio Crime Task Force in Lima Ohio from 2014 – 2016, and assigned as a road patrol trooper from 2004 – 2014.

3. During the course of my law enforcement career, I have had experience in debriefing defendants and interviewing participating witnesses, cooperating individuals and other persons who have personal knowledge and experience regarding the trafficking of controlled substances and the amassing, spending, conversion, transportation, and concealment of records and proceeds of trafficking in controlled substances.

### II.

### PURPOSE OF AFFIDAVIT

4. This affidavit is made in support of an Application for a federal search warrant for each of the following premises:

    a. The residential property located at **3149 Fayburrow Drive, Reynoldsburg, Fairfield County, Ohio 43068 to including all outbuildings and curtilage** (hereinafter referred to as **TARGET LOCATION 1**). This premises is more fully described in Attachment A which is attached and incorporated herein by reference.

1

      b. The residential property located at **3923 Blueglade Drive, Canal Winchester, Ohio, Franklin County, Ohio 43110** (hereinafter referred to as **TARGET LOCATION 2**). This premises is more fully described in Attachment B which is attached and incorporated herein by reference.

5. Based upon the information below, I have probable cause to believe that inside **TARGET LOCATION 1** and **TARGET LOCATION 2** there is property that constitutes evidence of the commission of a criminal offense; contraband, the fruits of crime, and things otherwise criminally possessed; and property designed or intended for use or which is or has been used as a means of committing a criminal offense. Specifically, I have probable cause to believe that within **TARGET LOCATION 1** and **TARGET LOCATION 2** there is evidence of violations of Title 21, U.S.C. § 846, Conspiracy to Possess with Intent to Distribute and Distribute a Controlled Substance (Methamphetamine, Fentanyl and Cocaine) and Title 21, U.S.C. § 841(a)(1), Possession with Intent to Distribute and Distribution of a Controlled Substance. Based on my training and experience, as described above, I believe that there is probable cause to believe that the items listed in Attachment C (which is attached and incorporated herein by reference) will be found in **TARGET LOCATION 1** and **TARGET LOCATION 2**.

6. The information contained in this Affidavit is largely based upon investigations conducted by your Affiant and other law enforcement officers. All of the details of the investigation are not included in this Affidavit, only information necessary to establish probable cause that evidence associated with the drug trafficking offenses referenced above is located at/in the **TARGET LOCATION 1** and **TARGET LOCATION 2**.

### III.

### FACTS SUPPORTING PROBABLE CAUSE

7. Beginning in August 2020, the DEA Columbus District Office began investigating a drug trafficking organization (DTO) in Columbus, Ohio that was distributing methamphetamine and cocaine to multiple counties in central and southeast Ohio. This DTO was being sourced from suppliers in New York and California.

A. **Pennsylvania Traffic Stops – August 2020**

8. In August 2020, on two separate occasions, Pennsylvania State Police initiated a traffic stop on vehicles being driven in Pennsylvania that were en route to Ohio. The first vehicle, occupied by two individuals, was driven by Jayneisha Brooks and pursuant to consent, troopers were permitted to search the vehicle. Troopers located approximately 3.5 kilograms of cocaine and approximately 350 green pills suspected of containing fentanyl inside the vehicle. The cocaine and suspected fentanyl pills were sent to the crime lab for further analysis. The passenger, Lamont Moody, admitted that he was transporting the drugs with the intent of delivering them to Columbus, Ohio.

9. Within a week of the first stop, Pennsylvania Troopers initiated a second traffic stop on a vehicle driven by Max Sajous. After a positive alert by a certified narcotic detecting canine, troopers searched the vehicle and located four cellular and an aftermarket hidden compartment in the vehicle. Approximately one kilogram of cocaine and two additional cellular telephones were located inside the hidden compartment. The suspected cocaine was submitted to Pennsylvania State Police Crime Laboratory and was confirmed to be 1,008 grams of cocaine, a Schedule II controlled substance.

10. Max Sajous was questioned about the cocaine and stated he was delivering it to Reynoldsburg, Ohio, to a black male using phone number 614-348-6854. Max Sajous made a phone call to phone number 614-348-6854 during the traffic stop. Your Affiant reviewed the recorded call and identified the voice to be consistent with other audio recordings of Tristan Johnson.

**B.   DEA Interview with CS1 – September 2020**

11. In September 2020, your Affiant and other DEA investigators interviewed a confidential source of information (CS1). CS1 was deemed trustworthy and reliable based on the information provided by CS1 being able to be independently corroborated by DEA investigators. CS1 advised that he/she was aware of a DTO in Columbus, Ohio that was being supplied by sources in New York. CS1 stated that he/she was personally involved in the DTO and was aware that the two recent traffic stops in Pennsylvania were related to the DTO. CS1 further advised that he/she had previously assisted in loading these and other vehicles in New York with drugs and also had previously made trips to Ohio with the drugs beginning in May 2020. CS1 was able to provide a physical description of the individual in Columbus that received the drugs, as well as the telephone number for that individual, 614-348-6854. The description provided by CS1 matched the physical description of Triston Johnson. CS1 was also able to provide a description of the residence in Ohio where the drugs were delivered as well as directions to the residence. The description was consistent with the appearance and directions to TARGET LOCATION 1. Based upon his personal observations and conversations with Johnson, CS1 stated Johnson regularly receives up to four kilograms of cocaine on a monthly basis from a New York based source of supply.

12. CS1 additionally stated that Johnson primarily traffics methamphetamine and is supplied by an unknown California based source of supply. CS1 further stated Johnson purchases methamphetamine in $100,000.00 increments.

**C.   Identification of Tristan Johnson**

13. Your Affiant conducted a query of commercial databases for telephone number 614-348-6854 and identified Tristan Johnson as the reported user, with an associated address of TARGET LOCATION 1. Your Affiant also conducted a computerized criminal history and Ohio Bureau of Motor Vehicles check on Johnson which revealed Johnson to have multiple convictions for drug possession, drug trafficking, and weapons charges. The records check

3

additionally revealed Johnson to have TARGET LOCATION 1 as his address reported to the Ohio Bureau of Motor Vehicles.

14. In August 2020, upon learning the identity of Johnson, law enforcement showed a photograph of Johnson to CS1 who identified the individual as the intended recipient for the cocaine seized from Lamont Moody and Max Sajous and additionally to be the user of telephone 614-348-6854. CS1 stated he/she has personally met Johnson on at least two prior occasions. CS1 was also shown a photograph of TARGET LOCATION 1. CS1 confirmed TARGET LOCATION 1 to be the residence of Johnson and also confirmed he/she had delivered drugs to Tristan Johnson at TARGET LOCATION 1.

### D. Ohio Department of Rehabilitation and Correction Recorded Calls and J-Pay Message Review

15. During the course of this investigation, beginning in August 2020 and continuing through March 2021, your Affiant has reviewed any communications within the Ohio prison system related to 614-348-6854. The Ohio Department of Correction and Rehabilitation (ODRC) oversees all individuals incarcerated in the Ohio prison system. ODRC offers phone and J-Pay messaging services for incarcerated individuals to communicate with family and associates outside the corrections setting. The phone calls are recorded, and the J-Pay messages are preserved in accordance to ODRC procedures. Your Affiant has full access to the ODRC recorded call and J-Pay systems.

16. Your Affiant conducted a query of the ODRC J-Pay messaging system for accounts opened and associated with telephone number 614-348-6854 and located J-Pay account 13300061, which was established on April 8, 2015. The listed user information for the account was: Name: T J, Address: 3149 Fayburrow Drive, Reynoldsburg, Ohio, 43068 (Notably, this address is TARGET LOCATION 1), and email address: J.tristan381980@gmail.com. The information also included a date of birth for the account holder reflecting a birth year of 1980 which is consistent with the birth year of Tristan Johnson.

17. Your Affiant reviewed, for 90 days prior, multiple J-Pay messages sent from the J-Pay account associated with Johnson. The review revealed multiple photos of Johnson, photos of a customized Suzuki Hayabusa motorcycle, and a large bag containing an unknown amount of US Currency. (While conducting surveillance in this investigation, beginning in August of 2020, and continuing through March of 2021, your Affiant and other law enforcement observed Johnson entering and exiting TARGET LOCATION 1 on multiple occasions. Law enforcement also observed Johnson on multiple occasions, during the summer and fall of 2020, riding the same customized Suzuki Hayabusa motorcycle that was pictured in the previously referenced J-Pay messages.)

18. Your Affiant reviewed recorded telephone call from November of 2020 between Johnson, using phone number 614-348-6854, and an incarcerated individual identified as C.B. The conversation between Johnson and C.B. included Johnson discussing current drug prices with C.B., specifically a recent increase in prices. Johnson told C.B. "a whole one is 50 and 4 for the other, it was down to 25 and 3." C.B. discussed with Johnson that "it's hard to

4

make ends meet" when it's down to 25 and 3. Johnson told C.B. that a girl was up to 50, C.B. questioned "The whole bitch for 50?" Based on training and experience, your Affiant recognized this conversation to be Johnson and C.B. to be discussing the prices of a kilogram of powder cocaine being up to $50,000.00 and a pound of methamphetamine to be $4,000.00. Your Affiant is aware that "girl" is common street slang for powder cocaine. Your Affiant is additionally aware that $25,000.00 to $35,000.00 is the normal price for a kilogram of cocaine in the Columbus, Ohio, area. Your Affiant is additionally aware that the COVID-19 pandemic caused the price of cocaine to increase to $45,000.00 to $50,000.00.

19. In February 2021, your Affiant reviewed J-Pay messages between Johnson and C.B. Johnson indicated to C.B. that he had just obtained a new phone number and provided 614-779-9383. Your Affiant, through multiple investigative means including telephone toll analysis, has confirmed 614-779-9383 to be a replacement telephone number that is in use by Johnson.

### E. Verizon Wireless Records - SMS Content 614-348-6854

20. Conducting phone toll analysis, your Affiant determined that Verizon Wireless was the service provider for 614-348-6854. In August, September and October 2020, your Affiant sought and obtained multiple search warrants for Verizon Wireless records for stored content of SMS text message contents for 614-348-6854. Upon reviewing the records previously referenced, your Affiant noted that the account subscriber was Becca Freeland and phone number 740-777-8259 was listed as a secondary number on the account. Upon further reviewing the records provided, your Affiant noted among others, three conversations of interest.

21. The following is a synopsis of a conversation occurring on September 12, 2020 extracted from the Verizon Wireless records and is not all inclusive of the conversation involving Johnson and an unknown person utilizing phone number 614-495-6400.

| PH6400: | "My nigga got some boxes in bred.. .58s..." |
| 6854 (Johnson): | "Okay bet I'm still loaded but soon as I get low I'm hit ya line" |
| PH6400: | "Bet I still need u on other tooo bred..." |
| 6854 (Johnson): | "Just lmk" |
| PH6400 | Got u, wat u doin ur single girls for? Still 2bd" |
| 6854 (Johnson): | "Yeah they 2" |

Based on training and experience, your Affiant recognized this conversation to be a drug related conversation between Johnson and PH6400. Your Affiant is aware that "bred" is street slang for narcotics, "girl" is street slang for powder cocaine, and "bands" or "bd" is street slang for $1,000.00 of U.S. Currency. Your Affiant believes PH6400 is informing Johnson that PH6400's source of supply obtained a new supply of unknown narcotics. Johnson informs PH6400 that Johnson still has narcotics but will contact PH6400 if Johnson needs resupplied. PH6400 then asked Johnson if the price for one ounce of cocaine is still $2,000.00 and Johnson confirms the $2,000.00 price.

5

22. The following is a synopsis of another conversation occurring on September 13, 2020 extracted from the Verizon Wireless records and is not all inclusive of the conversation involving Johnson and an unknown person utilizing phone number 740-400-7122.

| | |
|---|---|
| 6854 (Johnson): | "What's up bro" |
| PH7122: | "Not shit hey u still fucking around with that. Cream" |
| 6854 (Johnson): | "Yeah " |
| PH7122: | "What's ticket on a zip" |
| PH7122: | "If u got on deck I'll come whenever u ready" |
| 6854 (Johnson): | "550 rn" |
| PH7122: | "What about half" |
| PH7122: | "On deck" |
| 6854 (Johnson): | "On deck " |
| 6854 (Johnson): | "Just be zips n up" |

Based on training and experience, your Affiant recognized this conversation to be drug related conversation between Johnson and PH7122. Your Affiant is aware that "Cream" is street slang for methamphetamine, a "ticket" is a request for a price, a "zip" is a quantity of 1 ounce of illegal narcotics, and "on deck" is street slang for immediately available or ready for sale. Your Affiant believes PH7122 is asking Johnson if he still traffics methamphetamine. Johnson confirms that he does currently sell methamphetamine and PH7122 asks the price for one ounce. Johnson confirms he currently has methamphetamine to sell for $500.00 per ounce. Johnson additionally states that he only sells methamphetamine in quantities of one ounce or higher.

23. The following is a synopsis of another conversation occurring on October 27, 2020 extracted from Verizon Wireless records and is not all inclusive of the conversation between Johnson and an unknown person utilizing phone number 740-705-1330.

| | |
|---|---|
| PH1330: | "I'm trying to come see u early tomorrow" |
| 6854 (Johnson): | "Ok" |
| PH1330: | "When u get a sec will u count that n let me kniw what i owe u " |
| PH1330: | "You want me to call you when I get up in the morning and that sucked up day couple days" |
| PH1330: | MMS Message – Content Unknown |
| PH1330: | MMS Message – Content Unknown |
| PH1330: | "Why you do that?" |
| PH1330: | "I was joking " |
| 6854 (Johnson): | "On my other line" |
| PH1330: | "Pk" |
| PH1330: | "Ok" |
| 6854 (Johnson): | "3923 blueglad drive \nCanal Winchester 43110" |
| PH1330: | "I'm ready whenever you are" |

6

Based on training and experience, your Affiant recognized this conversation to be a conversation where PH1330 informs Johnson that PH1330 wants to meet with Johnson the following day for the purpose of providing Johnson with an unknown amount of U.S. Currency. Your Affiant believes PH1330 has previously provided Johnson with a partial payment and is asking Johnson to count U.S. Currency and inform PH1330 how much he still owes Johnson. PH1330 then sends a series of MMS messages with unknown content and gets no response from Johnson. PH1330 questions Johnson about the lack of reply and Johnson informs PH1330 that he's talking on his other phone. Johnson then directs PH1330 to meet at 3923 Blueglad Drive, Canal Winchester (TARGET LOCATION 2). Your Affiant is aware that drug traffickers commonly utilize multiple cellular phones as a method to conduct clandestine narcotics trafficking operations to avoid detection from law enforcement. Your Affiant additionally knows that it is common for narcotics traffickers to provide narcotics at no cost but with the agreement the receiver would repay the debt. It is additionally known to your Affiant that drug related debts are repaid in partial payments.

### F. Arrest of R.F. and Search of 65 Dakota Avenue, Columbus – November 30, 2020

24. On November 30, 2020, Investigators from the Ohio State Highway Patrol were conducting a stolen vehicle investigation in the area of 65 Dakota Avenue, Columbus, Ohio. Investigators observed a male walking out of 65 Dakota Avenue carrying a backpack and enter the stolen vehicle. Troopers made a traffic stop and arrested the male for being in possession of the stolen truck. The male stated he was staying at 65 Dakota Avenue (which was an Airbnb residence) with his wife, identified for purposes of this affidavit as R.F.

25. The troopers conducted a search of the backpack that the male was observed carrying and located suspected methamphetamine and a digital scale. The suspected methamphetamine was later sent to the Ohio State Highway Patrol Crime Laboratory and confirmed to be 58 grams of methamphetamine. Your Affiant was called to the scene by the troopers to assist with a drug investigation after the suspected methamphetamine was located.

26. Shortly after, R.F. arrived on the scene and advised that the male was her husband and additionally confirmed they were coming from 65 Dakota Avenue, an Airbnb residence which she had rented. Your Affiant asked R.F. for permission to search the residence and she consented. Law enforcement searched the residence and located approximately 258 grams of methamphetamine in an upstairs bedroom.

27. Upon being interviewed, R.F. provided your Affiant with a phone number ending in 8630 as her current contact information. On December 4, 2020, your Affiant applied for and received a search warrant for Verizon Wireless, the service provider, seeking records for stored SMS message content. Verizon Wireless provided stored records dated November 30, 2020 through December 4, 2020. Upon reviewing those records, your Affiant noted the following text messages between R.F. and an unknown individual utilizing a number ending in 8513 regarding the search of 65 Dakota Ave.

7

| | | |
|---|---|---|
| R.F.: | "They asked where he was staying " | |
| R.F.: | "He gave them my fucking address " | |
| R.F.: | "They searched my house " | |
| R.F.: | "They took everything " | |
| PH8513: | "O shit" | |
| R.F.: | "Bc they weren't able to determine who the items in the house belonged they didn't arrest me " | |
| R.F.: | "I'm so upset he did that \nHe fucking knew better " | |
| PH8513: | "Luck" | |
| R.F.: | "Didn't even give me a heads up " | |
| PH8513: | "No shit that's fucked up" | |
| R.F.: | "The got all the trees and I had just got some new really good shit " | |
| R.F.: | "Carts and edibles " | |
| R.F.: | "And over a half pound of jewelry" | |

Based on training and experience, your Affiant believes the conversation between R.F. and an unknown person is discussing the search of 65 Dakota Avenue which resulted in law enforcement seizing marijuana, THC products, and over a half a pound of methamphetamine. Your Affiant is aware that "trees" is street slang for marijuana, "carts and edibles" is street slang for THC products, and "jewelry" is street slang for methamphetamine.

28. In January 2021, Investigators from the Fairfield-Hocking (Ohio) Major Crimes Unit (MCU) were conducting surveillance on a residence in Hocking County that was known to be used by Kyle Visintainer to traffic methamphetamine. Investigators observed R.F. and Kyle Visintainer exit the residence and enter a vehicle known to regularly be driven by R.F.. A few minutes later, Logan Police Department made a traffic stop on the vehicle and arrested Kyle Visintainer on an active warrant. A probable cause search of the vehicle revealed 163 grams of methamphetamine and a handgun.

29. Following the traffic stop, R.F. was interviewed by Detective Woodgeard of the MCU. R.F. stated that she was currently staying at an Airbnb located at 2071 N. Fourth Street, Columbus, Ohio. R.F. advised that additional methamphetamine, marijuana, and a handgun was currently stored at that residence. Detective Woodgeard contacted Columbus Police Detective Scarpitti regarding the information from R.F.. Detective Scarpitti applied for and received a search warrant for the residence. Detective Scarpitti and other members of law enforcement executed the search of 2071 N. Fourth Street and located 54 grams of methamphetamine and two handguns.

30. Upon further interview, R.F. stated that Johnson was her source of supply since summer 2020 for methamphetamine and that she had additionally purchased cocaine and marijuana from Johnson. R.F. stated she had received approximately 3 pounds of methamphetamine per week from Johnson for the last 10 months. R.F. stated she had made two trips to New York during the summer of 2020 for Johnson to pick up drugs and transport them back to Johnson in Ohio. R.F. stated Johnson paid her $2,000 for each trip. R.F. stated Johnson provided her with methamphetamine free of charge after the search of 65 Dakota Avenue.

8

R.F. also stated she has met Johnson at TARGET LOCATION 1 and TARGET LOCATION 2 on multiple occasions. R.F. advised that Johnson uses both locations to store and traffic methamphetamine and cocaine. R.F. also stated Johnson has a safe in the garage of TARGET LOCATION 1 and another one in a bedroom of TARGET LOCATION 2. R.F. further stated Johnson stores narcotics in the trunk of his vehicles, backing them into parking spots to make it harder for others to access the trunk. R.F. confirmed that Johnson was her primary source of supply for methamphetamine since June 2020, to include the 258 grams of methamphetamine seized from 65 Dakota Avenue, the 163 grams of methamphetamine seized from the traffic stop, and the 54 grams of methamphetamine seized from 2071 N. Fourth Street.

31. Your Affiant then reviewed phone toll analysis of records for the 614-348-6854 used by Johnson and the telephone number used by R.F., 740-777-8259, and observed multiple occurrences of conversation between them.

G. **Other Agency Information – CS2**

32. In February 2021, your Affiant was contacted by Special Agent (SA) Paul Mills of the United States Homeland Security Investigations (HSI). SA Mills stated he had recently been contacted by a confidential source of information (CS2) regarding Johnson. CS2 is believed to be truthful and reliable based upon information CS2 provided that was independently corroborated by SA Mills and other members of law enforcement or information received resulted in the seizure of controlled substances. SA Mills stated CS2 had provided information that, based upon personal observation and participation, Johnson was supplying large amounts of methamphetamine and cocaine to Muskingum County, Ohio beginning in summer of 2020 and continuing through March 2021. CS2 described Johnson as the primary source of supply for the area. CS2 identified TARGET LOCATION 1 and TARGET LOCATION 2 as the two primary locations used by Johnson to traffic narcotics. CS2 stated he/she has been inside both locations as recently as January 2021. CS2 additionally stated Johnson has a safe in the garage of TARGET LOCATION 1 that Johnson uses to store narcotics and U.S. currency. CS2 stated Johnson has a bedroom at TARGET LOCATION 2 that he uses to store narcotics and U.S. Currency. CS2 stated Johnson will not travel long distances with narcotics. CS2 stated Johnson previously used phone number 614-348-6854 but recently switched to 614-779-9383.

H. **Interaction between Johnson and Undercover Officer**

33. In September 2020, your Affiant was contacted by Sergeant Matt Whilhite of the Muskingum County Sheriff's Office who provided information that Tristan Johnson was identified as supplying large amounts of methamphetamine to narcotics traffickers in Muskingum County, Ohio. Sgt. Whilhite stated that Detective Gerau of the CODE (Ohio) Drug Task Force had participated in undercover conversations with Johnson using Facebook Messenger, iMessage, and traditional telephone calls.

34. In September 2020, Detective Gerau initiated the interactions by sending a Facebook friend request to Facebook account ID "Tristan.Johnson.7923." The account name is listed to

9

Tristan Johnson and has multiple open source photos of Johnson. The friend request was accepted and Detective Gerau began interacting with Johnson. Detective Gerau indicated he was struggling to receive narcotics, Johnson replied by directing him to call 614-348-6854. Detective Gerau sent an iMessage to Johnson and identified himself using his undercover identify. Detective Gerau the stated he was trying to make "moves" but it was "dry." Johnson then initiated a traditional wire communication to Detective Gerau. The following is a synopsis of the conversation between Johnson and Detective Gerau. Johnson stated he sells cocaine for $2,000.00 per ounce and methamphetamine for $550.00 per ounce. Detective Gerau and Johnson could not agree upon a location to meet and no narcotics purchase was made.

## I. Tristan Johnson Facebook Account - Tristan.Johnson.7923

35. In October 2020, your Affiant applied for received a search warrant for Facebook account records associated with account ID "Tristan.Johnson.7923." Upon reviewing the records, the following is a synopsis and is not all inclusive of the records and contents of the records provided by Facebook regarding account ID "Tristan.Johnson.7923." Your Affiant observed multiple photos of Johnson that had been sent or received by Johnson via personal messages between Johnson and other individuals. Your Affiant additionally observed photographs of guns that had been sent to Johnson via personal messages, the messages additionally requested guidance from Johnson regarding the appropriate price for the guns. Your Affiant additionally observed photographs containing large amounts of U.S. Currency.

36. The following is a synopsis of a conversation between Johnson and Timi Lyn Mayle occurring on July 8, 2020 and continuing into July 9, 2020. Timi Lyn Mayle asked Johnson if he had any "Ice", Johnson replies back, "Always" and directs Timi Lyn Mayle to call him at 614-348-6854. Timi Lyn Mayle and Johnson can't agree on a meeting place, and Timi Lyn Mayle tries to get Johnson to deliver to Zanesville, Ohio. Johnson refuses to deliver the methamphetamine and the conversation ended. Based on training and experience, your Affiant is aware that "Ice" is a common slang term for methamphetamine

37. The following is a synopsis of a conversation between Johnson and Timi Lyn Mayle on July 12, 2020. Timi Lyn Mayle agreed to meet Johnson in the Columbus area and Johnson directs Timi Lyn Mayle to TARGET LOCATION 1. Johnson was not at TARGET LOCATION 1 when Timi Lyn Mayle arrived. Johnson advises Timi Lyn Mayle that he's at his "plug" and it took a while to "count." Based on training and experience, your Affiant is aware that "plug" is a common street slang term for a source or supply or location to store/receive illegal narcotics. Your Affiant additionally believes that Johnson was not immediately available to meet with Timi Lyn Mayle's arrival at TARGET LOCATION 1 due to Johnson being at another location counting U.S. Currency.

38. In another conversation on July 20, 2020, Timi Lyn Mayle inquired of Johnson if he has "hard candy." Johnson replied back "Soft." Timi Lyn Mayle then requests "a quarter" and states they need to "cook" it. Johnson replied back "$550." Timi Lyn Mayle stated they were at "the house". Johnson asked who was with Timi Lyn Mayle and directed Timi Lyn

10

Mayle to meet at the Thirsty Turtle. Your Affiant is aware that the Thirsty Turtle is a bar near TARGET LOCATION 1 and TARGET LOCATION 2. It is known to your Affiant that "Soft" is a common street slang for powder cocaine and "cook" is to be street slang for making powder cocaine into crack cocaine. Through training and experience, your Affiant believes this conversation between Johnson and Timi Lyn Mayle is to arrange the purchase of ¼ ounce of powder cocaine from Johnson for $550. Through training and experience, your Affiant additionally believes the questioning by Johnson regarding who was in the car with Timi Lyn Mayle and the redirection to the Thirsty Turtle to be a technique to prevent a person unknown to Johnson from observing drug trafficking at Johnson's residence.

### J. Trash Pulls at Target Location 1

39. In January 2021, your Affiant and other members of law enforcement conducted a trash pull of the trash deposited from TARGET LOCATION 1. Your Affiant and other members of law enforcement observed a City of Columbus trash receptacle deposited at the curb in near TARGET LOCATION 1, the trash receptacle was stenciled with the text "3149. One bag of trash was removed from the receptacle and moved to a safe location for further inspection. Your Affiant and other members of law enforcement searched the contents of the bag and located a 10" x 10" scent-proof bag which contained white powder residue. Your Affiant immediately recognized the scent-proof bag to be consistent with bags used by narcotics traffickers to block the odor of narcotics from narcotics detecting canines. Your Affiant additionally identified the white powder residue to be consistent with the appearance of cocaine residue. Your Affiant later conducted a presumptive test of the white powder residue and it tested positive for the presumptive presence of cocaine. Mail addressed to Roosevelt Johnson, 3149 Fayburrow Drive (TARGET LOCATION 1), was located inside the bag of trash. From reviews of commercial databases, Ohio BMV records, and Facebook posts made by Tristan Johnson, it is known to your Affiant that Roosevelt Johnson is the father of Tristan Johnson and they both reside at TARGET LOCATION 1.

40. In February 2021, your Affiant and other members of law enforcement conducted a second trash pull of the trash deposited from TARGET LOCATION 1. Your Affiant and other members of law enforcement observed the same City of Columbus trash receptacle deposited at the curb in near TARGET LOCATION 1. One bag of trash was removed from the receptacle and moved to a safe location for further inspection. Your Affiant and other members of law enforcement located mail addressed to Tristan Johnson at 3149 Fayburrow Drive (TARGET LOCATION 1).

### K. Charleston, West Virginia – CS3 and CS4

41. In February 2021, your Affiant was contacted by TFO Evan Wilson from FBI – Charleston, West Virginia in regard to Johnson. TFO Wilson interviewed a confidential source of information, hereinafter referred to as CS3, that had personal knowledge regarding Johnson and his trafficking of methamphetamine from TARGET LOCATION 1. Information provided by CS3 has been corroborated and found to be credible by your Affiant and other members of law enforcement.

42. CS3 stated that he/she had personally driven D.B. to TARGET LOCATION 1 in late January or early February 2021. CS3 stated he/she parked in the driveway of TARGET LOCATION 1 and an unknown male, with a physical description matching Johnson, came out of the house and sold one pound of methamphetamine to D.B. TFO Wilson showed CS3 photographs of Johnson and TARGET LOCATION 1, CS3 confirmed Johnson to be the unknown male and TARGET LOCATION 1 to be the residence in which he drove D.B. to.

43. In March 2021, your Affiant and other members of law enforcement participated in an interview with a confidential source of information, hereinafter referred to as CS4. CS4 was represented by counsel during the interview and answered questions under a use immunity agreement. Information provided by CS4 has been corroborated and found to be credible by your Affiant and other members of law enforcement.

44. CS4 stated he/she travels to the Columbus, Ohio, area to purchase methamphetamine from an individual he/she knows as "Trey." CS4 provided a physical description for "Trey" that is consistent with the physical description of Johnson. CS4 was shown a photograph of Johnson which CS4 confirmed to be "Trey". CS4 stated he/she had also previously purchased marijuana from Trey (Johnson).

45. CS4 stated he/she had personally purchased marijuana and methamphetamine from "Trey" (Johnson) for two to three years. CS4 stated he/she has purchased six to eight ounces of methamphetamine from Trey (Johnson), twice a month, for the last year. CS4 stated the most methamphetamine he/she had received from Trey (Johnson) was twelve ounces in March 2020.

46. CS4 stated he/she has met Johnson at both TARGET LOCATION 1 and TARGET LOCATION 2 for the purpose of purchasing methamphetamine. CS4 was shown photographs of TARGET LOCATON 1 and TARGET LOCATION 2. CS4 confirmed TARGET LOCATION 1 and TARGET LOCATION 2 to be the meeting locations used by Johnson.

47. CS4 was involved in a law enforcement encounter during Spring 2021 that resulted in the seizure of over 50 grams of methamphetamine. CS4 stated he/she had personal knowledge the seized methamphetamine was purchased from Johnson at TARGET LOCATION 2.

**L.  Surveillance of Johnson**

48. Since August 2020, your Affiant and other members of law enforcement have conducted regular surveillance of Johnson. This surveillance has included Johnson's activities at TARGET LOCATION 1, TARGET LOCATION 2, and other locations. The following is a synopsis of the events observed during the surveillance of Johnson but is not an all-inclusive list of observed activities.

49. In August 2020, your Affiant and other members of law enforcement were conducting surveillance at TARGET LOCATION 1 and observed a vehicle with two occupants pull

into the driveway. A female passenger in the vehicle entered TARGET LOCATION 1. The female passenger and Johnson exited TARGET LOCATION 1 almost immediately after the female had entered. Johnson and the female had a short duration contact in the driveway while the male remained in the vehicle. Johnson reentered TARGET LOCATION 1 and the vehicle left the area. Your Affiant conducted a query of the vehicle's registration through the Ohio BMV and learned the registered owner lives in Madison County, Ohio. Based on training and experience, your Affiant identified this short duration visit between Johnson and the vehicle to be consistent with the appearance of a hand to hand narcotics transaction. Your Affiant additionally knows that it is common practice for individuals living outside large cities to travel into a city for the reason of purchasing narcotics.

50. On multiple occasions since August 2020, your Affiant and other members of law enforcement observed Johnson and R.F. meet at TARGET LOCATION 1 and TARGET LOCATION 2. The surveillance of Johnson and R.F. included interactions in the driveway of TARGET LOCATION 1 and also included R.F. meeting with Johnson inside TARGET LOCATION 1 and TARGET LOCATION 2.

51. Your Affiant and other members of law enforcement additionally observed Johnson regularly go to the Thirsty Turtle in the area of TARGET LOCATION 1 and TARGET LOCATION 2. This is the same bar referenced earlier in this affidavit. Based on training and experience, your Affiant knows that narcotics traffickers commonly meet customers and co-conspirators inside public establishments, such as bars, as a method to conduct clandestine drug sales to avoid detection by law enforcement and to protect the identity of their residence or other locations used by them to conduct criminal activity.

52. Your Affiant and other members of law enforcement have continually observed Johnson at TARGET LOCATION 1 and TARGET LOCATION 2 on a near daily basis, with the last occasions being during the third week of March 2021. Johnson has been observed using a key to gain access to TARGET LOCATION 1 and TARGET LOCATION 2. Johnson has been observed removing residential trash bags from inside TARGET LOCATION 1 and TARGET LOCATION 2 and placing it in garbage receptacles for collection. Johnson has additionally been observed checking the mail at TARGET LOCATION 1. Your Affiant believes Johnson has care and control over TARGET LOCATION 1 and TARGET LOCATION 2 based on his possession of keys and being able to access to locations with no one else present and his actions of checking the mail and removing trash from the locations.

53. Your Affiant and other members of law enforcement were conducting surveillance at TARGET LOCATION 2 during March 2021 and observed Johnson and a female exit the location and leave together.

**M.    Surveillance of Johnson and Traffic Stop on May 13, 2021**

54. On May 31, 2021, your Affiant and other members of law enforcement were conducting surveillance at TARGET LOCATION 1 and TARGET LOCATION 2. Officers observed

13

a black 2009 Audi A5 that is known to be regularly driven by Johnson parked in the parking lot of TARGET LOCATION 2. Officers also observed a silver 2009 Lexus IS250 that is known to be regularly driven by Johnson parked in the driveway of TARGET LOCATION 1. Your Affiant and other members of law enforcement observed Johnson come and go from TARGET LOCATION 1 multiple times during the surveillance.

55. Continuing on the same date, your Affiant observed a maroon Jeep park directly in front of TARGET LOCATION 1. The driver, who was later identified as the vehicle's registered owner, T.G, exited the Jeep, and entered the front door of TARGET LOCATION 1. A female, identified as O.F., remained in the passenger seat of the Jeep while T.G. went inside. T.G. exited the front door of TARGET LOCATION 1 and returned to the Jeep. T.G. was inside TARGET LOCATION 1 for seven minutes. Based on training and experience, your affiant identified this short duration visit to be consistent with drug trafficking patterns of an individual making residential narcotics sales.

56. Your Affiant and other members of law enforcement maintained surveillance on T.G. as he exited the area in the Jeep. Your Affiant requested assistance from Trooper Lindsey Barrett of the Ohio State Highway Patrol. Trooper Barrett observed a violation and made a traffic stop at milepost 119 on Interstate 70 in Licking County, Ohio.

57. During the course of the stop, Trooper Barrett utilized her narcotics detecting trained canine to conduct a free air sniff of the Jeep. Trooper Barrett advised her canine gave a positive indication to the presence of narcotic odor. Trooper Barrett, with the assistance of Trooper Jeff McNamara, conducted a probable cause search of the Jeep. Trooper Barrett located a bag of cocaine concealed inside a shoe that was sitting on the back seat of the Jeep.

58. Trooper Barrett advised T.G. of his Miranda rights, he acknowledged his right and did not request an attorney. Trooper Barrett questioned T.G. about the cocaine and he stated he paid $3,000.00 for it and purchased it at a house in Reynoldsburg. T.G. told Trooper Barrett that O.F. was not involved in any activities associated to the cocaine.

59. Trooper Barrett transported T.G. to the DEA office for processing. Your Affiant and other members of law enforcement conducted a post arrest interview of T.G. who was again advised of his Miranda Rights, he acknowledged he understood his rights by signing a rights waiver form. T.G. agreed to answer questions without an attorney present. T.G. stated he had met with a black male he knows as "Tristan" at his house to purchase the cocaine. T.G. stated he met with "Tristan" in the kitchen of the house. T.G. was unable to provide the address but gave detailed directions to TARGET LOCATION 1. T.G. identified a photo of TARGET LOCATION 1 to be the house where he purchased the cocaine. T.G. stated he paid $2,900.00 for the cocaine. T.G. was shown a photograph of Johnson and confirmed Johnson to be the male that he knows as "Tristan."

60. Your Affiant processed the cocaine that was seized from Gheen in accordance with DEA procedures. The cocaine was tested and tested positive for the presumptive presence of cocaine. The cocaine was found to weigh approximately 90.3 gross grams.

## IV.

## COMMON CHARACTERISTICS OF DRUG TRAFFICKERS

61. Based on my training, education, and experience, as well as training, education, and experience of other law enforcement officers, I know:

   a. That drug traffickers often amass significant assets from their illegal drug trafficking activities.

   b. That drugs traffickers often maintain large amounts of U.S. currency derived from illegal activities. It is common for individuals to secret contraband and conceal proceeds of drug sales and records of drug transactions in secure locations such as personal residences or businesses where they have ready access and control. Often, these locations are used to conceal the existence of substantial wealth from law enforcement authorities.

   c. That drug traffickers also attempt to legitimize their profits by converting it into other assets, such as stocks, bonds, precious metals, jewelry, real estate, vehicles, and other assets. To accomplish these goals, these individuals utilize false and fictitious business records, nominee purchasers, foreign and domestic banks, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate shell corporations and business fronts. These individuals conceal, in their residences, businesses, safes, safe deposit boxes, storage units and vehicles, currency, cashier's checks, money orders and other negotiable instruments, as well as the records relating to the acquisition, conversion, movement, transfer, and disbursement of these funds and assets. Additionally, the drug traffickers themselves usually control access to these areas. Further, it is not uncommon for narcotics traffickers to "legitimize" their funds through casinos, documenting their "winnings" in an attempt to show an additional source of income.

   d. That drug smugglers are not unlike other members of society in that they rely on credit and debit cards to make financial payments. Records relating to the use of these cards can provide valuable information to the investigation by establishing, among other things, the amount of money that is being spent by the suspects, their travel patterns (e.g., using a credit card to pay for gasoline on a cross-country trip), and may further identify businesses which are associated with the illegal activities of the suspects.

   e. That drug traffickers deal in currency and store currency in conveyances, homes and at business sites. Furthermore, the Currency Transaction Report (CTR) (IRS Form 4789) is required to be completed and filed with the Internal Revenue Service by all financial institutions on every currency transaction that exceeds $10,000. This requirement causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at financial institutions because these reports can be made available to law enforcement officials. It is quite common for

individuals who deal in illegal controlled substances to convert drug proceeds (currency) into cashier's checks and or money orders in amounts less than $10,000 at numerous financial institutions over the course of several days in order to avoid the CTR filing requirement. Furthermore, drug traffickers often recruit other individuals to convert drug proceed currency for them in order to avoid handling the currency themselves.

f. That drug traffickers use financial habits designed to minimize and hide a paper trail. Traffickers often purchase and/or title their assets in fictitious names, aliases, or in the names of relatives, friends, associates, or business entities to avoid detection of these assets by government agencies, especially the Internal Revenue Service. Regardless of documented ownership, the drug traffickers continue to use these assets and exercise control over them.

g. That drug traffickers maintain books, records, receipts, notes, ledgers, bank records, accounting records and other papers relating to the importation, manufacture, transportation, ordering, sale, and distribution of controlled substances. These ledgers often contain amounts of drugs; accounting of payments made and received, accounts receivable and accounts payable used in furtherance of their drug trafficking activities. These individuals commonly "front" (provide illegal controlled substances on consignment) illegal controlled substances to their clients and thus keep some type of record concerning moneys owed. Drug traffickers often maintain phone books, address books and other papers containing names, telephone numbers, and addresses of suppliers and purchasers of controlled substances. The names and numbers are often written in a code that requires drug traffickers to keep a key to their particular code.

h. The aforementioned books, records, receipts, notes, ledgers, codes, etc., are usually maintained in a secure location where dealers in illegal controlled substances have ready access to them such as on their person, vehicle, business, safe deposit box, home safe, personal or business computer, storage facility or in other residences or businesses where they periodically reside or have access and control.

i. It is not uncommon for individuals who deal in illegal controlled substances to take, or cause to be taken, photographs of themselves, their associates, their property and their illegal product. These individuals usually maintain these photographs in their possession or in residences where they reside or have access and control.

j. That drug traffickers commonly use cellular telephones to coordinate various narcotics trafficking activities. Other traffickers, in order to avoid speaking on telephones, use numeric codes on electronic devices to communicate with co-conspirators.

k. That drug traffickers often engage in domestic and/or international travel in relation to the smuggling of illegal contraband. Analysis of travel records and documents can assist in the development of the investigation by revealing potential source

16

and/or destination locations related to the distribution of illegal narcotics or the payment of related proceeds.

l. Persons who traffic in controlled substances are not unlike any other individual in our society in that they maintain documents and records. These documents and records will normally be retained for long periods regardless of whether their value to the individual has diminished. Often times, this type of evidence is generated, maintained, and subsequently forgotten about. Hence, documents that one would normally think a prudent person would destroy because of their incriminating nature are still possessed months or even years after they come into the possession of a drug trafficker. Often times these individuals do not even realize the incriminating nature of the documents they keep.

## V.

## CONCLUSION

62. Based on the facts set forth in the Affidavit, your Affiant believes there is probable cause to believe that evidence of a crime; contraband, fruits of crime, or other items illegally possessed; and property designed for use, intended for use, or used in committing a crime and associated with the above listed drug trafficking offenses is located inside the **TARGET LOCATION 1** and **TARGET LOCATION 2**. WHEREFORE, based on the foregoing evidence of drug trafficking, I respectfully request that the Court issue a search warrant for the locations described in the respective Attachment A and Attachment B, and the property described in Attachment C. Investigators request that this warrant be SEALED until further order of the Court

_____
Christopher L. Ellison
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me
this __13__ of May 2021

_____
CHELSEY M. VASCURA
UNITED STATE MAGISTRATE JUDGE

17